ORIGINAL

IN THE
UNITED STATES COURT OF FEDERAL CLAIMS

FILED
DEC 29 2006
U.S COURT OF FEDERAL CLAIMS

06-925 L

**THE SIOUX NATION OF INDIANS[1]**
**(a/k/a "THE OCETI SAKOWIN OYATE"),**
**for and on behalf of itself and as *parens patriae* for**
**its members and THE OGALA SIOUX TRIBE,**
**THE CHEYENNE RIVER SIOUX TRIBE,**
**THE STANDING ROCK SIOUX TRIBE and**
**THE ROSEBUD SIOUX TRIBE for and on behalf of**
**themselves, individually, and as *parens patriae* for**
**their members,**

Plaintiffs,

vs.

**THE UNITED STATES OF AMERICA;**

Defendant.

**COMPLAINT**

Plaintiffs, THE SIOUX NATION OF INDIANS (a/k/a THE OCETI SAKOWIN OYATE collectively) and THE OGALA SIOUX TRIBE, THE CHEYENNE RIVER SIOUX TRIBE, THE STANDING ROCK SIOUX TRIBE, and THE ROSEBUD SIOUX TRIBE individually, hereby allege, upon information and belief, against THE UNITED STATES OF AMERICA as follows:

---

[1] The People of The Seven Council Fires (The Oceti Sakowin Oyate) have historically been referred to by United States Courts as "The Sioux Nation of Indians" (See e.g. United States v. Sioux Nation of Indians 448 U.S. 371 [1980]). The word "Sioux" is understood by many Tribal members to be derived from a French distortion of a term that was meant to be derogatory. We, therefore, respectfully request that the Court identify and refer to Plaintiffs as "The Oceti Sakowin Oyate."

## Statement of the Case

1. This is an action for money damages against the United States. This case arises out of the Defendant's past, present and continuing breaches of constitutional, statutory, regulatory, and fiduciary accounting and management duties owed to Plaintiffs with regard to Indian Tribal trust funds held by Defendant in trust for Plaintiffs.

## Parties

2. Plaintiff Oceti Sakowin Oyate is the organization of the Tiospaye (Family); Oshpa (Clan); Band and Sakowin (Council Fire) Leaders of the historic Great Sioux Nation that comprises The Sioux Nation of Indians: these Seven Council Fires being: the Mdewakanton, the Wahpetowan (Wahpeton), the Wahpekute, the Sissetowan (Sisseton), the Ihantowan (Yankton), the Ihanktowana (Yanktonai), and the Teton (Lakota).

3. Plaintiffs, THE OGLALA SIOUX TRIBE, THE CHEYENNE RIVER SIOUX TRIBE, THE STANDING ROCK SIOUX TRIBE, and THE ROSEBUD SIOUX TRIBE, are federally-recognized Indian tribes residing on federal reservations located within the States of South Dakota and North Dakota, recognized by the United States as sovereign Indian tribes with legal rights and responsibilities, eligible for the special programs and services provided by the United States to Indians because of their status as federally-recognized Indian tribes.

4. Defendant, United States, holds lands in trust for Plaintiffs and owes Plaintiffs fiduciary duties with respect to, *inter alia*, the administration and management of the land and the income derived thereof.

## Jurisdiction and Venue

5. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1491 and 1505 in that the action involves continuing claims brought by Indian tribes residing within the territorial limits of the United States, against the United States for money damages, and arising under the Constitution, laws, treaties, and regulations of the United States.

## Background

6. Prior to the year 1781, Plaintiffs and/or their predecessors in interest asserted and exerted sole and exclusive custody and control over approximately ninety million (90,000,000) acres of land that included all of what is today known as the State of South Dakota; large portions of what is today known as the State of North Dakota; significant portions of what is today known as the States of Wyoming and Montana; and portions of what is today the States of Minnesota, Iowa and Nebraska.

7. In 1787 the Government of the United States, functioning under The Articles of Confederation, enacted The Northwest Ordinance of 1787 "securing the economic interests of the United States in The Sioux Territory" and setting forth the express commitment of the United States Government to "always observe the utmost good faith toward the Indians" and promising that their property would never be taken from them without their consent, and that in their property, rights, and liberty, the Lakota People were never to be invaded or disturbed unless in just and lawful wars, authorized by Congress and laws founded in justice and humanity, as shall, from time to time, be made for preventing wrongs being done to them and for preserving peace and friendship with them.

8. In an 1830 Act of Congress establishing The Permanent Indian Country (Act of May 28, 1830, 4 Stat.411, ch. 148), the United States Congress designated a "Permanent Indian Country reserved for the sole occupancy and use of the aboriginal people" the eastern boundary of which was fixed by Congress at the Mississippi River along the western boundaries of Louisiana, Arkansas, Missouri, Iowa and Minnesota, promising that all 90,000,000 acres of the Traditional Sioux Territory that belonged to the Plaintiffs that lay west of this boundary would remain Plaintiffs' secure and undisturbed home "for as long as the grass shall grow and the water run."

9. Notwithstanding the aforementioned official United States Government commitments, on or about June 15, 1845, the United States Government dispatched United States Army Colonel S.W. Kearney and five companies of armed United States soldiers to the Laramie Fork of the Platte River, an area within the previously established "Permanent Indian Country" and at all times relevant herein and specifically between 1845 and 1851, the United States Government permitted citizens of the United States to trespass on the Permanent Indian Country.

10. In or about 1851, the United States appointed Thomas Fitzpatrick and David Dawson Mitchell to enter into a lawfully binding Treaty with The Sioux Nation.

11. In or about 1851, Messers. Fitzpatrick and Mitchell entered into the Treaty of Fort Laramie of 1851 on behalf of the Government of the United States and purported to reduce the size of the "Permanent Indian Country" recognizing Sioux Dominion over only sixty million (60,000,000) acres of the 90,000,000 acres of The Great Sioux Nation, from Missouri on the east to beyond the Black Hills, and from the Platte River north to the Heart River.

12. In this Treaty of Fort Laramie of 1851, the United States Government, however, expressly recognized the absolute right of the "Western Band" of The Sioux Nation (i.e. of the Teton Council Fire of The Oceti Sakowin Oyate ) to the sole and exclusive custody and control over all of their traditional Lands west of The Missouri River, including all of what is now the State of South Dakota, and specifically-identified portions of what are now the States of Montana, Wyoming, North Dakota, and Nebraska as being reserved for the perpetual sole and exclusive occupancy of and use by The Great Sioux Nation.

13. The Treaty of Fort Laramie of 1851, however, was neither accepted by the Plaintiffs' predecessors in interest, nor by authorized agents on their behalf.

14. In or about 1868, the United States, using improper means, including but not limited to fraud, deceit and the intentional starvation of members of the Sioux Nation, procured, by means of coercion, the Treaty of Fort Laramie of 1868.

15. The Treaty of Fort Laramie of 1868, *inter alia*, required that the members of The Sioux Nation confine their homes to an area described as "The Great Sioux Reservation of 1868."

16. The Great Sioux Reservation of 1868 encompassed all of present day South Dakota west of the Missouri River "for the absolute and undisturbed use and occupancy of the Sioux."

17. To the north and west of this permanent Great Sioux Reservation of 1868, the Treaty of Fort Laramie of 1868 (in Article 16) designated the land "north of the North Platte

River and east of the summits of the Big Horn Mountains" as "unceded Indian territory" where no white man could set foot without Indian consent.

18. Most significantly, Article 12 of the Treaty of Fort Laramie of 1868 expressly provided that no future diminishment of The Great Sioux Reservation of 1868 would be valid or enforceable against The Great Sioux Nation unless the Government of the United States collected and certified the ratifying signatures of three-fourths of all adult male members of The Sioux Nation of Indians.

19. This explicit Agreement notwithstanding, in or about 1889, the Government of the United States, by means of an Act commonly referred to as the General Allotment Act, subdivided out, from approximately one-fifth of The Great Sioux Reservation of 1868, six separate "Reservations" and without the consent of three-fourths of the adult male members of The Sioux nation of Indians - unilaterally seized the remaining four-fifths of The Great Sioux Reservation of 1868.

20. The 1889 seizure of Sioux lands by the Defendant United States was not authorized by three-fourths of all adult Sioux males.

21. Approximately one-fifth of the land that was the subject of the 1889 Act was placed "in trust" under the control of the United States Government as its Trustee.

22. Members of Oceti Sakowin Oyate (known to The Court as The Sioux Nation of Indians) occupy some 21 "Reservations" in the United States and Canada, *among which are:* The PINE RIDGE RESERVATION in South Dakota; The CHEYENNE RIVER RESERVATION in South Dakota, The ROSEBUD RESERVATION in South Dakota, and The

STANDING ROCK RESERVATION in South Dakota and North Dakota (all of which were "created" by the 1889 Act), and these United States Government "recognized" Tribes are the beneficial owners of the land and natural resources, including valuable oil, gas, water and other mineral reserves, within said "Reservation" boundaries established by The 1889 Act, title to which is however held in trust by the United States for the benefit of said Tribes. These Tribe's lands also include land valuable for grazing and agricultural purposes.

23. Under Federal Law, Tribal Land held in trust by the United States is inalienable except as authorized by Congress. 25 U.S.C. §177. Congress has granted the Secretary of the Interior authority to approve conveyances of certain interests in said trust lands, such as leases, easements, and rights of way. Federal Law further establishes the terms and conditions under which such conveyances may be made, and requires that "just compensation" be paid to each Tribe for the "use" of their Tribal Trust lands authorized by the Defendant United States Secretary of The Interior.

24. By various Acts of Congress, commencing with statutes adopted more than a century ago, Congress authorized the Secretary of the Interior to collect income from Tribal Trust Property and directed the Secretary of the Interior to deposit such Trust Income in the United States Treasury and other depositary institutions for the benefit of the Tribe for whose benefit said lands were held in trust by The United States. E.g. Act of March 3, 1883, c 141§ 1, 22 stat. 590.

25. By subsequent statutes, Congress directed that interest be paid on tribal trust funds, and required that such trust funds be invested. See e.g. Act of February 12 1929, c. 178,

45 Stat. 1164, codified as amended, 25 U.S.C § 161b; Act of June 24, 1938, 52 Stat. 1037, codified as amended, 25 U.S.C§162a.

26. Defendant assumed and exercised unilateral control and management over said Trust Property of each Oceti Sakowin Oyate Tribe. The United States Secretary of the Interior has approved leases, easements and grants of other interests in said trust lands of each Oceti Sakowin Oyate Tribe since 1889, and Defendant has assumed responsibility for collection, deposit and investment of the income generated by said Tribal Trust Land of each Oceti Sakowin Oyate Tribe. These include funds generated by oil and gas bid deposits, bonuses, rents, lease and royalty payments, grazing and agricultural leases, and judgments paid to the Tribe.

27. Because the United States holds said Tribal Trust Land in trust, it has assumed the obligations of a trustee. United States v. Mitchell, 463 U.S. 206, 225 (1983); Cobell v. Norton, 240 F.3d 1081 (D.C. Cir. 2001).

28. As trustee, the United States has a fiduciary relationship and obligations of the highest responsibility and trust to administer the trust with the greatest skill and care possessed by the trustee. The United States '''has charged itself with moral obligations of the highest responsibility and trust in its conduct with Indians, and its conduct 'should therefore be judged by the most exacting fiduciary standards.''' Cobell 240 F.3d at 1099 (quoting Seminole Nation v. United States, 316 U.S. 286, 297 (1942)).

29. The trust obligations of the United States include, among other duties, the duty to ensure that said Tribal Trust Property and Trust Funds are protected, preserved and managed so as to produce a maximum return to the tribal owner consistent with the trust character of the property.

30. The trust obligations of the United States include, among other duties, the duty to maintain adequate records with respect to the Tribal Trust Property; to maintain adequate systems and controls to guard against error or dishonesty; to provide regular and accurate accountings to the Trust Beneficiaries; to refrain from self-dealing or benefiting from the management of the Tribal Trust Property.

31. Indeed, the Congress of the United States has expressly charged the Defendant with fulfilling the obligation of the United States as Trustee of these Tribal trust lands and with responsibility for the full and honest administration and management of all said Tribal Trust Property of each Oceti Sakowin Oyate Tribe.

32. Defendant controls all of the books and records of account affecting trust funds and trust property.

33. Defendant has never rendered an audit or accounting to any Oceti Sakowin Oyate Tribe for its trust monies.

34. Defendant has further failed to establish any effective system or provision for regular or periodic accounting for the Tribal Trust Property and Trust Funds of any Oceti Sakowin Oyate Tribe.

35. Defendant has kept and continues to keep each Oceti Sakowin Oyate Tribe, as the Trust Beneficiary, uninformed as to the Tribal Trust Property it owns; what income said Tribal Trust Property has produced, and what disposition has been made of any income generated by said Tribe's Tribal Trust Property.

36. The United States Inspector General for the Department of the Interior, the United States General Accounting Office, and the United States Congress, among others, have concluded that there are massive and long-standing problems with the Defendant's administration of Indian trust funds.

37. Congress issued a report condemning the practices of the Department of the Interior's management of Indian trust funds. See Misplaced Trust, Bureau of Indian Affairs Mismanagement of the Indian Trust fund, H.R. Rept. No, 102-499, 102d Cong. 2d Sess. (1992).

38. Specifically, Congress found:

> Scores of reports over the years by the Interior Department's Inspector General, the U.S. General Accounting Office, the Office of Management and Budget, have documented significant, habitual problems in BIA's ability to fully and accurately account for trust fund moneys, to properly discharge its fiduciary responsibilities and to prudently manage the trust funds [Id. At 2] . . .
>
> The Bureau has repeatedly ignored directives to undertake needed management reform measures. [Id. At 3] . . .
>
> As a result of this dismal history of inaction and incompetence, there is no assurance that the Bureau actually desires to, or will, make any substantial advancement toward rectifying the basic financial management failures brought to their attention. Despite a decade of initiatives, the Bureau's headquarters, leadership and accountability continue to be woefully inadequate. . .
>
> It is apparent that top Interior Department officials have utterly failed to grasp the human impact of its financial management of the Indian trust fund. The Indian trust fund is more than balance sheets and accounting procedures. These moneys are crucial to the daily operations of native American tribes and a source of income to tens of thousands of native Americans. [Id. at 5].

Congress further found the Defendant's administration of Indian trust funds to be:

> grossly inadequate in numerous important respects. The Bureau [of Indian Affairs] has failed to accurately account for trust fund moneys. Indeed, it cannot even provide account holders with meaningful periodic statements on their balances. It cannot consistently and prudently invest trust funds and pay interest to account holders. It does not have consistent written policies or procedures that cover all of its trust fund accounting practices. Under the management of the Bureau of Indian Affairs, the Indian trust fund is equivalent to a bank that doesn't know how much money it has.

Id. at 56.

39. Upon information and belief, Defendant's mismanagement of trust funds has resulted in losses to each Oceti Sakowin Oyate Tribe, as Trust Beneficiary. The extent of such losses is unknown to Plaintiffs because Defendant has failed to provide any Oceti Sakowin Oyate Tribe with an accounting of its Tribal Trust Funds, and further have failed to maintain accurate books and records of account, have lost and destroyed relevant trust account records, failed or refused to disclose known losses to the trust beneficiaries, failed or refused to reimburse trust beneficiaries for losses to their trust funds. See Misplaced Trust, H.R. Rept. No, 102-499 at 37-41.

40. By the Act of December 22, 1987, Pub. L. No. 100-202, 101 Stat. 1329, Congress imposed two requirements on Defendant: 1) that it audit and reconcile Tribal Trust Funds and 2) that it provide each Trust Tribe with a full accounting of such Tribal Trust Funds. Congress reaffirmed the two mandates of the 1987 Act in subsequent statutes, namely the Act of October 23, 1989, Pub. L. No. 101-121, 103 Stat. 701; the Act of November 5, 1990, Pub. L No. 11-512, 104 Stat. 1915, and the Act of November 3, 1991, Pub. L. No. 102-154, 105 Stat. 990. By these Acts, Congress further required that the Defendant certify, through an independent party, the results of the reconciliation of Tribal Trust Funds as the most complete reconciliation possible of such funds.

41. To protect the rights of Tribes until accountings of their Tribal Trust Funds could be completed, Congress has provided, in each Interior Department Appropriations Act since 1990 that "the statute of limitations shall not commence to run on any claim concerning losses to or mismanagement of trust funds until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss." See Act of November 5, 1990, Pub. L No. 101-512, 104 Stat. 1915; Act of November 13, 1991, Publ. L. No. 102-154, 105 Stat. 990; Act of October 5, 1992, Pub. L. No. 102-381, 106 Stat. 1374; Act of November 11, 1993, Pub. L. No. 103-138, 107 Stat. 1379; Act of September 30, 1994, Pub. L. No. 103-332, 108 Stat. 2499; Act of April 26, 1996, Publ. L. No. 104-134, 110 Stat. 1341; Act of September 30, 1996, Pub. L. No. 104-208, 110 stat. 3009; Act of November 14, 1997, Pub. L. No. 205-83, 111 Stat. 1543; Act of October 21, 1998, Pub. L. No. 105-277, 112 Stat. 2681; Act of November 29, 1999, Pub L. No. 106-113 Stat. 1501; Act of October 11, 2000, Pub. L. No. 106-291, 114 Stat. 922; Act of November 5, 2001, Pub. L. No. 107-63.

42. On October 25, 1994, Congress enacted the American Indian Trust Fund Management Reform Act, codified at 25 U.S.C. §§ 4001-61. Under this Act, Congress recognized the United States' pre-existing trust responsibilities, and charged the Defendant with additional responsibilities to ensure proper discharge of the trust responsibilities, and charged the Defendant with additional responsibilities to ensure proper discharge of the trust responsibilities of the United States. These include the duty to provide periodic, timely accountings of trust fund to tribal and individual Indian beneficiaries, and the duty to cause an annual audit of all trust funds to be conducted. 25U.S.C. §4011; 25 U.S.C. §162a(d).

43. As evidenced by reports issued by Interior Department Inspector General, the General Accounting Office, and the Office of Management and Budget, among others, notwithstanding the foregoing Acts of Congress, Defendant has continued to fail to implement the reforms required by law. The Defendant's continued failure to implement reforms required by Congress and to provide timely and meaningful accountings to the Individual Indian Land Allottees who received individual land allotments from The Acts of 1887 and 1889 is now the subject of pending litigation in federal court, Cobell v. Norton, No. 96-1285 (D.D.C.). The proceedings in that case, which are focused on trust accounts of Individual Indian Land Allottees, establish the Defendant's breach of those obligations to The Oceti Sakowin Oyate Tribes as well by the Defendant's failing to account. See Cobell v. Babbitt, 91 F. Supp. 2d 1(D.D.C. 1999), aff'd sub norm Cobell v. Norton 240 F. 3d 1081 (D.C. Cir. 2001).

44. To date, the Defendant has failed to provide any Oceti Sakowin Oyate Tribe with an accounting of said Tribe's Tribal Trust Funds.

45. Defendant has failed to remit to Plaintiffs trust funds that are due and owing to Plaintiffs.

**COUNT I**

46. Plaintiffs reallege Paragraphs 1-45.

47. As a direct result of Defendant's continuing failure of accounting, mismanagement, and other breaches of trust, described above in Paragraphs 1 -45, Plaintiffs have suffered continuing fiscal damage, Defendant has been continually unjustly enriched, and substantial sums of money are owed by Defendant to Plaintiffs.

**COUNT II**

48. Plaintiffs reallege Paragraphs 1-47.

49. Defendant's continuing actions and conduct, described above in Paragraphs 1-47, have resulted directly in a continual taking of Plaintiffs' money in violation of Defendant's constitutional, fiduciary, statutory, and regulatory responsibilities.

**COUNT III**

50. Plaintiffs reallege Paragraphs 1-49.

51. Through treaty, statute, and regulation, Defendant has expressly and impliedly contracted to account for, manage, and otherwise act as trustee for Plaintiffs.

52. Defendant's actions and conduct, described above in Paragraphs 1-49, constitute a continual breach of the express and implied contracts to account for, manage, and otherwise act as trustee of the trust maintained by the Defendant for the benefit of Plaintiffs.

**COUNT IV**

53. Plaintiffs reallege Paragraphs 1-52.

54. Defendant has failed to collect and/or remit to Plaintiffs the rental value of lands wrongfully seized from Plaintiffs and to which Plaintiffs do not cede title, in particular the Black Hills Lands commonly referred to as the subject of "Dockets 74a and 74b" which lands Plaintiffs seek to have returned.

55. Plaintiffs are entitled to payment of such rental values from Defendant.

## RELIEF

WHEREFORE, Plaintiffs pray that this Court:

1. make a determination that Defendant as fiduciary trustee is liable for money damages to the Plaintiffs for the continuing injuries and losses caused to them by the Defendant's continuing negligence, wrongful conduct, or other breaches of trust up to and including the entry of final judgment in this case;

2. for the purpose of assisting this Court in determining the amount of money damages owed Plaintiffs, order Defendant to render a full and complete account of: all of the rental value withheld or not collected by Defendant; Defendant's actions as trustee of the land held in trust by Defendant for Plaintiffs for the time period up to and including the date of entry of final judgment in this case, and including, but not limited to, an accounting as to the amounts and dates of 1) all moneys received and disbursed by Defendant; 2) all investments made by Defendant including the investment and reinvestment of income; 3) all income collected by Defendant; and, 4) all profits and losses incurred by Defendant in its accounting and management;

3. award Plaintiffs money damages in an amount sufficient to make them whole as if there had been no breaches of trust, negligence, or wrongdoing by Defendant up to and including the date of entry of final judgment in this case which amount is to be determined at trial but believed to exceed $100 Billion;

4. award Plaintiffs attorneys' fees, expert witness costs, and other costs of this action without limitation; and,

5. award Plaintiffs such other relief as the Court may deem appropriate.

Dated: New York, New York
December 28, 2006

**MCCARTER & ENGLISH, LLP**

By: *Francis Kirk*
Francis A. Kirk, Esq.
A Member of the firm

Attorneys for Plaintiffs
245 Park Avenue
New York, NY 10167
Tel.:212.609.6800
Fax:212.609.6921

Of Counsel:

**McCarter & English, LLP**
Eugene R. Scheiman, Esq.
Robert S. Bernstein, Esq.

**DANIEL PETER SHEEHAN, ESQ**
c/o THE LAKOTA PEOPLES' LAW OFFICE
The Carnegie Library Building
145 N. Chicago Street
Hot Springs, South Dakota 57747
Tel.: 605.745.4275
Fax: 605.745.5786